**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

UNITED STATES OF AMERICA

VS.                                CASE NO: 6:18-cr-34-Orl-40TBS

FABIO LUIS VALDARNINI
_____/

## **ORDER**

This cause is before the Court on Defendant Valdarnini's Motion to Suppress evidence, (Doc. 35), and the Government's Response in Opposition, (Doc. 42). The Court held an evidentiary hearing on July 6, 2018. (Doc. 45). Upon due consideration of the pleadings and the testimony and exhibits offered during the evidentiary hearing, Defendant's Motion to Suppress is denied.

### **I. BACKGROUND**[1]

Defendant Valdarnini rented room number 1618 at Disney's Art of Animation hotel, and he used an American Express credit card to secure the room. (Doc. 1, ¶ 6). On January 31, 2018, Walt Disney World ("WDW") investigator Cheryl Ann Regiacorte received an e-mail from the finance department informing her of a problem with the credit card used to pay for the hotel room. The finance department voiced its concern that the American Express credit card was being fraudulently used to transact purchases at the Disney Springs shopping and dining complex. Investigator Regiacorte contacted American Express about the subject card and learned the card was being used to

---

[1] The pertinent facts cited herein are adduced from the Affidavit in support of the Criminal Complaint and the testimony and exhibits presented during the evidentiary hearing. Neither party has ordered a transcript of the evidentiary hearing; hence, all quotations of testimony are based upon the rough transcript and the Court's notes.

perpetrate a fraud. The credit card was issued on a Mexican bank and the address of the card holder was associated with a hotel in Miami. By the time Investigator Regiacorte was contacted by the finance department, the outstanding unpaid balance on the credit card was several thousand dollars.[2] Accordingly, a hold was placed on the credit card.

Investigator Regiacorte notified WDW Investigator William Sims of the credit card fraud, and Investigator Sims testified that American Express will not allow Disney to retain the payments received by the holder of a fraudulently acquired credit card. After conferring with the manager of the hotel, they proceeded to the hotel room to conduct a security and wellness check of the room. (Doc. 1, ¶ 7). Investigator Regiacorte testified that it is not uncommon for a person to use a fraudulent credit card to secure a hotel room, which provides the guest certain services, and never occupy the room. The purpose of going to the hotel room was to determine whether the room was occupied and to speak with the occupants. Moreover, Investigator Regiacorte testified that Disney has a policy of taking control of hotel rooms when guests fail to make payment.

Before noon on January 31, 2018, Investigators Regiacorte and Sims knocked on the door to room 1618. (*Id.*). When nobody answered the door, the investigators used a master key to gain entry. (*Id.*). Upon entering the room, Investigators Regiacorte and Sims observed luggage and a significant number of plastic cards with magnetic strips, commonly called access cards, located on various counters and tables. (*Id.*).

---

[2] Special Agent Chmiel was informed that the American Express ending in 5005 had been used to accrue approximately $5,000 in purchases. (Doc. 1, ¶ 9).

Investigator Sims testified that the presence of numerous Disney passes was suspicious because only two individuals were listed on the reservation.[3]

Investigators Regiacorte and Sims are trained to recognize credit card fraud. Investigator Regiacorte has worked for Disney for the past fifteen years as a security investigator. Investigator Regiacorte training included a course of study provided by the Association of Certified Fraud Examiners, and she passed a four-part test to become certified. Similarly, Investigator Sims has extensive financial crime investigative experience, having worked for Disney as an investigator for the past 30 years. Both investigators have received training on the detection of credit card fraud by the United States Secret Service, and they both are familiar with Secret Service Special Agent ("SA") Chmiel and have his cellular phone number.

After the investigators observed what appeared to be evidence of credit card fraud in the hotel room, Investigator Sims called the Orlando Secret Service Office and SA Chmiel returned his call. Investigator Sims relayed to SA Chmiel that a guest had obtained a hotel room at the Art of Animation Resort using what appeared to be a fraudulent credit card. Investigator Sims explained that the dozens of access devices had been observed throughout the hotel room and told SA Chmiel that the guests had been locked out of the hotel room.

Investigator Regiacorte asked SA Chmiel to accompany her and hotel management to the room. Investigator Regiacorte knocked on the door of the room and, receiving no reply, used a master key to gain entry. She invited SA Chmiel to enter the

---

[3] Disney tickets are plastic cards with magnetic strips and look similar to credit or debit cards.

hotel room, (Doc. 1, ¶ 10), and he observed in plain view access devices on a table, countertop, and other services. SA Chmiel observed a suitcase that was partially open "like a clam shell," and the tag on the suitcase did not match the name used to secure the reservation. The name on the tag was "Valdarnini."

A short time later, four Hispanic males, one of whom was ultimately identified to be the defendant, attempted to enter the hotel room. (*Id.* at ¶ 11). Investigatory Regiacorte testified that two of the men walked away from the room in the direction of the elevator, but they returned to the room after she told them to come back. All four men were directed by SA Chmiel to enter the room and to sit down for officer safety. None of the men spoke English, and SA Chmiel testified that, by using gestures and with the assistance of a Disney employee who spoke Spanish, he was able to communicate with the men.[4] The four individuals are from Brazil and speak Portuguese, and the defense disputes whether they fully understood Spanish.[5] However, SA Chmiel testified that between the assistance provided by the Disney employee and his hand gestures, he was able to direct the men to empty their pockets and produce identification.

SA Chmiel testified that Defendant Valdarnini produced one identification in the name of Rodrigo Donadio Bueno and a second with the name Danilo Consentino Garcia. The second individual, identified as Alexandre Cariati, produced identification in the name

---

[4] The Spanish-speaking Disney employee communicated with the men over the hotel room phone via the speaker.

[5] SA Chmiel wrote in one report that the men did not speak Spanish very well.

4

of Fabricio Cesar Martins and Raphael Garcia Passos.[6] The third individual similarly presented identification with two fake names, and the fourth man did not have any identification documents.[7] (Doc. 1, ¶ 13).

Defendant Valdarnini told SA Chmiel via the Disney employee that his passport was located in his luggage. SA Chmiel testified that the Defendant gave him permission to retrieve the luggage from the adjoining room. SA Chmiel retrieved the suitcase and placed it on the bed. Both SA Chmiel and Investigator Regiacorte testified that the suitcase was apparently off-balance, and it fell to the floor. (*Id.*). A Sephora shopping bag fell out of the suitcase, spilling its contents onto the floor. (*Id.*). Dozens of credit cards and a skimming device were exposed to plain view. (*Id.*). A passport with the Defendant's true identify was also discovered in the suitcase. (*Id.*).

The defense called Alexandre Cariati to testify, and he stated that the Defendant's suitcase was closed when SA Chmiel retrieved it form the adjoining room. Mr. Cariati also testified that he did not recall the suitcase falling off of the bed and exposing the contents of the shopping bag.

## II. THE ISSUES

The Defendant's Motion to Suppress focuses only upon whether the items contained in the Sephora shopping bag were discovered in plain view, and whether SA Chmiel had the lawful right to access Mr. Valdarnini's luggage. (Doc. 35, p. 5). Having the

---

[6] Mr. Cariati testified during the hearing by video-conferencing, and he invoked the Fifth Amendment when asked about these forms of identification. He invoked his right to remain silent in response to other questions asked by the Government.

[7] The fake identification cards were introduced as Government Exhibit 3.

benefit of the evidentiary hearing and oral argument, the Court identifies the following issues:

1. Whether the WDW Investigators were acting as agents of federal law enforcement when they entered the Defendant's hotel room and observed the access devices?

2. Whether the Defendant's right to occupy the hotel room had been terminated prior to the WDW Investigators inviting SA Chmiel into the hotel room?

3. Whether the skimmer and access devices contained within the Sephora shopping bag are admissible under the plain view doctrine?[8]

## III. DISCUSSION

### A. Private Party Search

"The Fourth Amendment applies only to government action, and therefore is not applicable to searches and seizures made by private individuals not acting as agents of the government or with the participation or knowledge of a government official." *United States v. Roberts*, 888 F. Supp. 2d 1316, 1327 (N.D. Ga. Aug. 15, 2012) (citing *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). Put more directly, the "Fourth Amendment is wholly inapplicable to private-party searches." (*Id.*).

The Eleventh Circuit Court of Appeals has developed a two-factor test for determining when a private person is "acting as an instrument or agent of the government." *United States v. Propst*, 369 F. App'x. 42, 45 (11th Cir. 2010); *see also United States v. Steiger*, 318 F.3d 1039, 1045 (11th Cir. 2003). The district court is instructed to consider "(1) whether the government knew of and acquiesced in the

---

[8] The Defendant does not contend that SA Chmiel lacked authority or a legitimate basis to request order the men to sit down or to produce identification pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968).

intrusive conduct, and (2) whether the private actor's purpose was to assist law enforcement efforts rather than to further his own ends." *Steiger,* 318 F.3d at 1045; *Propst,* 369 F. App'x. at 45. In *United States v. Ford*, 765 F.2d 1088, 1090 (11th Cir. 1985), the Court held that the district court properly denied defendant's motion to suppress where there was no evidence the government had pre-knowledge of the search or openly encouraged or cooperated in the search.

Here, neither the Secret Service nor any state or federal law enforcement agency knew in advance that Investigators Regiacorte and Sims intended to enter the Defendant's hotel room and could not have acquiesced in that conduct. The safety and wellness inspection was motivated by information provided to the WDW investigators by Disney's finance office that credit card fraud was suspected, which suspicion was corroborated by the investigators' inquiry with American Express. Law enforcement officers did not assist or direct in the collection of the information that lead the WDW investigators to enter the hotel room.

As for the second prong of the analysis, the WDW investigators were motivated to enter the room from concern that American Express would not cover the charges being made by the Defendant on the credit card and to prevent credit card fraud from being perpetrated against Disney. It is certainly true that the investigators received some training from the Secret Service on fraud detection and prevention and knew to call the Secret Service once the access devices were observed in the hotel room. This, however, is a far cry from acting to assist law enforcement. By comparison, bank tellers receive training on the Bank Secrecy Act and anti-money laundering. When a bank teller identifies cash deposits divided to avoid the issuance of an IRS Form 8300 report of cash

payments, the teller knows to file a Suspicious Activity Report with FinCEN and may alert law enforcement authorities.[9] That the bank teller is trained to identify bank fraud or money laundering and reports such conduct does not morph the teller into an agent with the Federal Bureau of Investigation.

Investigators Regiacorte and Sims were indeed well-trained to identify credit card fraud, and knew to report what they knew and had observed to the Secret Service. Their actions in entering the hotel room were entirely private. They did not seek guidance from SA Chmiel before entering the room and did not contact him until after the access devices were discovered in the hotel room. Accordingly, the Fourth Amendment is not applicable to the private actions of WDW investigators.

### B. Expectation of Privacy in Hotel Room

In *Stoner v. State of California*, 376 U.S. 483 (1964), the Supreme Court held that the warrantless search of an individual's hotel room "can survive constitutional inhibition only upon a showing that the surrounding facts brought it within one of the exceptions to the rule that a search must rest upon a search warrant." *Id.* at 486 (citing *Jones v. United States*, 357 U.S. 493, 499 (1958)); *United States v. Jeffers*, 342 U.S. 48, 51 (1951); *Rios v. United States*, 364 U.S. 253, 261(1960). The Court concluded that "[n]o less than a tenant of a house, or the occupant of a room in a boarding house, a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures. That protection would disappear if it were left to depend upon the unfettered discretion of an employee of the hotel." *Id.* (internal citations omitted).

---

[9] FinCEN is the Financial Crimes Enforcement Network and collects data on suspicious financial transactions among other responsibilities.

The protections afforded to individuals under the Fourth Amendment depend upon whether the individual had "a legitimate expectation of privacy in the invaded place." *United States v. Cunag*, 386 F.3d 888, 893 (9th Cir. 2004) (citing *Rakas v. Illinois,* 439 U.S. 128, 143 (1978)). A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable. *Id.* at 893. In *Rakas*, the Court recognized that the exclusionary rule "would of course not avail those who, by virtue of their wrongful presence, cannot invoke the privacy of the premises searched." *Rakas*, 439 U.S. at 141 n.9. While one's legitimate presence on the premises is not controlling on the issue of one's expectation of privacy, it is relevant to that determination. *Id.* at 148.

In *Cunag*, the defendant sought suppression of stolen mail officers seized from a hotel room that he had procured by registering under a false name, using a dead woman's credit card, and providing forged authorization and identification documents. *Cunag*, 386 F.3d at 889; *see United States v. Bruce,* 396 F.3d 697, 709 n.7 (6th Cir. 2005) (noting that a defendant's use of an alias to obtain a hotel room lessened his privacy interest). The Court compared such fraudulently acquired occupancy to a "burglar plying his trade in a summer cabin during the off season." *Id.* at 894 (citing *Rakas,* 439 U.S. at 143 n.12). The Court noted that while the burglar might not expect to be discovered, he does not enjoy a Fourth Amendment privacy interest in the summer cabin. *Id.* ("[A] 'legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered."). Like the burglar, *Cunag* unlawfully gained entry to the premises. *Id.*

However, at least in the Ninth Circuit, the analysis does not end with a finding that the defendant's occupancy of the room has been procured by fraud. In *Cunag*, the court held that even if the occupant of a hotel room has procured that room by fraud, the

occupant's protected Fourth Amendment expectation of privacy is not finally extinguished until the hotel justifiably takes "affirmative steps to repossess the room." *Id.* at 895 (citing *United States v. Dorais,* 241 F.3d 1124, 1128 (9th Cir. 2001) (holding that "mere expiration of the rental period, in the absence of affirmative acts of repossession by the lessor, does not automatically end a lessee's expectations of privacy")); *c.f. United States v. Wai–Keung,* 845 F. Supp. 1548, 1562 (S.D. Fla.1994) (finding no reasonable expectation of privacy where defendants obtained hotel room with stolen credit card); *United States v. Spicer*, 549 F. App'x. 373 (6th Cir. 2013) (A hotel may lawfully terminate a guest's occupancy for unauthorized activity, including possession of illegal drugs). The Ninth Circuit found that the hotel manager had taken affirmative steps to repossess the room and to reassert control over it by locking the defendant out of the room and by calling law enforcement, which empowered the hotel staff to grant police permission to search the room. *Id.* at 890, 895.

During the evidentiary hearing, the Court engaged in the following colloquy with Investigator Sims:

> THE COURT: So at the time you and your colleagues entered the room that morning around noon, would in your view, Mr. Valdarnini or whoever the registered guest was of the room, still have the right to occupy the room until you -- until you entered the room and saw what you saw?
>
> THE WITNESS: Yes.
>
> . . .
>
> THE COURT: At what point in your view as an investigator and working with Disney, was Ms. Valdarnini's right to occupy that room terminated? When did that end.
>
> THE WITNESS: When he was trespassed.
>
> THE COURT: And when did that happen.

> THE WITNESS: The second time I responded out there was some time after that.
>
> THE COURT: All right 4:00 or thereabouts.
>
> THE WITNESS: I believe it was several hours after that.

When Investigator Regiacorte testified for the Government, the Court made the same inquiry with the following results:

> THE COURT: At the time that you exited the room that morning without having spoken to any of the registered guests, had they lost their right to occupy the room.
>
> THE WITNESS: Yes. That's when we locked the room out.
>
> THE COURT: Who makes that determination. Who is charged with making that determination.
>
> THE WITNESS: We made the determination after consultation with the hotel manager as well.
>
> THE COURT: Did that happen before the consultation did that occur before you left the room and locked it out or after.
>
> THE WITNESS: We discussed it with them as we were going to the room we're going to try to find out what's going on with the credit card see if we can get payment. If we can't we're gonna lock it down and speak with them.

It is undisputed that immediately after the WDW investigators observed the access devices in the hotel room, the United State Secret Services was contacted to investigate what clearly appeared to be criminal activity. While Investigators Sims and Regiacorte differ in their opinion as to when the Defendant's right to occupy the room had been terminated, the expiration of one's Fourth Amendment privacy interests in a hotel room is a matter for the Court to decide. Under either the analysis advanced by the Ninth Circuit Court of Appeals or the more liberal standard adopted by the Sixth Circuit Court of Appeals and the Southern District of Florida, Defendant Valdarnini's right to occupy the hotel room was terminated before SA Chmiel entered the hotel room. Accordingly, the

protection afforded by the Fourth Amendment against unlawful search and seizure was not violated by SA Chmiel.

C. **Plain View Doctrine**

To begin, the Court finds that SA Chmiel properly obtained consent from Defendant Valdarnini to retrieve his suitcase from the adjoining room. SA Chmiel testified that with the assistance of a Disney employee who spoke Spanish and the use of hand gestures, the Defendant consented to SA Chmiel's request to obtain the suitcase. While SA Chmiel reported that the Disney employee stated the four men did not speak Spanish very well, this does not mean the Defendant did not understand SA Chmiel's request. Even Mr. Cariati, who appears to have had some involvement in the offense conduct, testified that he understood some Spanish and comprehended SA Chmiel's instructions to sit, empty his pockets, and to produce identification. Defendant Valdarnini elected not to testify during the suppression hearing and, therefore, did not deny that he understood SA Chmiel's request.

The parties disagree over whether Defendant Valdarnini's suitcase was closed or was partially open when SA Chmiel moved it. Mr. Cariati testified that it was closed, and SA Chmiel and Investigator Regiacorte testified that the suitcase was not latched and was partially open when SA Chmiel placed it onto the bed. The Court had the opportunity to observe the witnesses and finds Mr. Cariati is not credible. The evidence showed that Mr. Cariati traveled to Orlando from Brazil and was in possession of two false identification documents. Moreover, Mr. Cariati invoked the Fifth Amendment when questioned by the prosecution. While invocation of one's right to remain silent is not determinative of one's credibility, the Court considers this fact within the context all of the facts of this case

including the presence of numerous access devices in the hotel room and Mr. Cariati's possession of fake identification. By comparison, SA Chmiel and Investigator Regiacorte testified in a clear and consistent manner. Accordingly, the Court finds the suitcase was partially open when it was retrieved by SA Chmiel.

Both SA Chmiel and Investigator Regiacorte testified that the suitcase fell off the bed after SA Chmiel placed it down. Investigator Regiacorte recalled observing that the suitcase appeared to be off balance and immediately fell to the floor exposing the contents of the Sephora shopping bag. This is precisely how SA Chmiel described the events. By contrast, Mr. Cariati testified that he did not recall seeing the suitcase fall from the bed. In that all four individuals were seated in close proximity to the bed, the Court finds Mr. Cariati's lack of memory of this event unconvincing. Once the Sephora bag spilled onto the floor, the access devices and skimmer were plainly visible to SA Chmiel. The plain view doctrine "permits the seizure of objects which fall within the 'plain view' of an officer who has a right to be in the position to have that view." *United States v. Watchmaker*, 761 F.2d 1459, 1472 (11th Cir. 1985); *see also Harris v. United States*, 390 U.S. 234, 236 (1968).

## IV. CONCLUSION

The initial safety and wellness inspection by the Walt Disney World investigators was purely private conduct. Neither SA Chmiel nor any other state or federal law enforcement officer had prior knowledge of the inspection and did not direct the investigators' activities. Hotel management acted in furtherance of their own interests by attempting to ensure that a guest was not committing credit card fraud on Disney property and by attempting to collect on the expenses incurred by the Defendant as a Disney

13

guest. Disney acted within their right to terminate room occupancy upon confirming criminal activity, and the investigators in conjunction with hotel management took affirmative steps to terminate the Defendant's occupancy by locking the room and notifying the Secret Service. Having obtained lawful possession of the hotel room, Disney personnel were permitted to invite SA Chmiel into the room. Once inside the room, SA Chmiel observed numerous access devices in plain view, had the right to temporarily detain the Defendant, and obtained consent to move the Defendant's luggage. The suitcase inadvertently fell from the bed, spilling the contents of the shopping bag and exposing to plain view the access devises and skimmer. Thus, the evidence seized by SA Chmiel was not collected in violation of the Fourth Amendment.

For the foregoing reasons, the Defendant's Motion to Suppress (Doc. 35) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida, on July 16, 2018.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties